**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL CROWE; STEPHEN CROWE;
CHERYL A. CROWE; JUDITH ANN
KENNEDY; SHANNON CROWE, a
minor, through guardian ad litem
STEPHAN CROWE; ZACHARY
TREADWAY; JOSHUA DAVID
TREADWAY; MICHAEL LEE
TREADWAY; TAMMY TREADWAY;
JANET HASKELL; MARGARET SUSAN
HOUSER; CHRISTINE HUFF; GREGG
HOUSER; AARON HOUSER,
            *Plaintiffs-Appellees,*

            v.

COUNTY OF SAN DIEGO; THE
CITY OF OCEANSIDE; CHRIS
MCDONOUGH; GARY HOOVER;
SUMMER STEPHAN; LAWRENCE
BLUM; CITY OF ESCONDIDO;
NATIONAL INSTITUTE FOR TRUTH
VERIFICATION; RICK BASS,
            *Defendants,*

            and

MARK WRISLEY; BARRY SWEENEY;
RALPH CLAYTOR; PHIL ANDERSON,
            *Defendants-Appellants.*

No. 05-55467

D.C. No.
CV-99-00241-JSR

8911

MICHAEL CROWE; STEPHEN CROWE;
CHERYL A. CROWE,
   *Plaintiffs-Appellants,*

SHANNON CROWE, a minor, through
guardian ad litem, STEPHAN
CROWE,
   *Plaintiff-Appellant,*

and

JUDITH ANN KENNEDY,
   *Plaintiff,*

ZACHARY TREADWAY; JOSHUA DAVID
TREADWAY; MICHAEL LEE
TREADWAY; TAMMY TREADWAY;
JANET HASKELL; MARGARET SUSAN
HOUSER; CHRISTINE HUFF; GREGG
HOUSER; AARON HOUSER,
   *Plaintiffs,*

v.

COUNTY OF SAN DIEGO; THE
CITY OF OCEANSIDE; CHRIS
MCDONOUGH; GARY HOOVER;
SUMMER STEPHAN; LAWRENCE
BLUM; CITY OF ESCONDIDO;
NATIONAL INSTITUTE FOR TRUTH
VERIFICATION; RICK BASS,
   *Defendants,*

and

MARK WRISLEY; BARRY SWEENEY;
RALPH CLAYTOR; PHIL ANDERSON,
   *Defendants-Appellees.*

No. 05-55542
D.C. No.
CV-99-00241-JSR

STEPHEN CROWE; CHERYL CROWE;
JUDITH ANN KENNEDY; SHANNON
CROWE, a minor through their
guardian ad litem, STEPHEN CROWE;
ZACHARY TREADWAY; JOSHUA DAVID
TREADWAY; MICHAEL LEE
TREADWAY; TAMMY TREADWAY;
JANET HASKELL,
                                *Plaintiffs,*

CHRISTINE HUFF,
                                 *Plaintiff,*

                and

MARGARET SUSAN HOUSER; GREGG
HOUSER; AARON HOUSER,
                *Plaintiffs-Appellants,*

                 v.

COUNTY OF SAN DIEGO; MARK
WRISLEY; BARRY SWEENEY; RALPH
CLAYTOR; CITY OF ESCONDIDO;
PHILLIP ANDERSON; SUMMER
STEPHAN; RICK BASS, Lieutenant,
                *Defendants-Appellees.*

No. 05-56311

D.C. No.
CV-99-00241-JSR

MICHAEL CROWE; STEPHEN CROWE; CHERYL A. CROWE; JUDITH ANN KENNEDY; SHANNON CROWE, a minor, through guardian ad litem STEPHEN CROWE,
*Plaintiffs-Appellants,*

and

ZACHARY TREADWAY; JOSHUA DAVID TREADWAY; MICHAEL LEE TREADWAY; TAMMY TREADWAY; JANET HASKELL; MARGARET SUSAN HOUSER; CHRISTINE HUFF; GREGG HOUSER; AARON HOUSER,
*Plaintiffs,*

v.

COUNTY OF SAN DIEGO; THE CITY OF OCEANSIDE; CHRIS MCDONOUGH; GARY HOOVER; SUMMER STEPHAN; LAWRENCE BLUM; CITY OF ESCONDIDO; NATIONAL INSTITUTE FOR TRUTH VERIFICATION; RICK BASS; MARK WRISLEY; BARRY SWEENEY; RALPH CLAYTOR; PHIL ANDERSON,
*Defendants-Appellees.*

No. 05-56364

D.C. No.
CV-99-00241-JSR

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
John S. Rhoades, District Judge, Presiding

Argued and Submitted
June 1, 2008—Pasadena, California

Filed January 14, 2010
Amended January 27, 2010
Second Amendment June 18, 2010

Before: Stephen S. Trott, Sidney R. Thomas, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Thomas

**COUNSEL**

Milton J. Silverman (argued), Robert T. Geile, Law Office of Milton J. Silverman; attorneys for plaintiffs-appellants and Cross-Appellees Michael Crowe, Stephen Crowe, Cheryl Crowe, and Shannon Crowe.

Jon R. Williams (argued), Lindsay J. Reese, Ross, Dixon & Bell; Dennis A. Schoville, Louis G. Arnell, James S. Iagmin, Schoville & Arnell; attorneys for plaintiffs-appellants and cross-appellees Aaron Houser, Margaret Susan Houser, and Gregg Houser.

John J. Sansone, County Counsel, County of San Diego, George W. Brewster Jr. (argued), Senior Deputy; attorneys for defendant-appellant Summer Stephan.

Richard J. Schneider, Glnar J. Fozi, Daley & Heft; Steven J. Renick (argued), Manning & Marder, Kass Ellrod, Ramirez; attorneys for defendants-appellees and Cross-Appellants City of Escondido, Mark Wrisley, Barry Sweeney, Ralph Claytor, and Phil Anderson.

Diana L. Field, Ferguson, Praet & Sherman; Timothy T. Coates, Cynthia T. Tobisman, Greines, Martin, Stein & Richland; attorneys for defendants-appellees and cross-appellants City of Oceanside, Oceanside Police Department, and Christopher McDonough.

Kenneth H. Moreno, Scott J. Loeding, Murchinson & Cumming; attorneys for defendant-appellee Lawrence N. Blum, Ph.D.

---

**ORDER**

The panel has voted to amend the opinion filed in this case. With the amendments, the panel has voted to deny the petitions for rehearing. Judge Thomas and Judge Fisher have voted to deny the petitions for rehearing en banc, and Judge Trott so recommends.

The full court has been advised of the petitions for rehearing en banc, and no judge of the court has requested a vote on the petitions for rehearing en banc. Fed. R. App. P. 35(b).

The petitions for panel rehearing and rehearing en banc are denied. No further petitions for rehearing will be entertained.

The opinion filed on January 27, 2010 is hereby amended as follows:

1.   The second full sentence, beginning on line 3 and continuing to line 4, at the top of Slip Op. page 1576 is deleted.

2.   The first full sentence, beginning on line 2 at the top of Slip Op. page 1579 is deleted, and the following inserted in lieu thereof:

> The following defendants are parties to this appeal: the City of Escondido and Escondido Police Detectives Mark WRISLEY, Phil Anderson, Barry Sweeney, and Ralph CLAYTOR (collectively "the Escondido defendants"); the City of Oceanside and Oceanside Police Detective Chris McDonough (collectively "the Oceanside defendants"); Dr. Lawrence Blum; and Assistant District Attorney Summer Stephan.

3.   The last sentence at the bottom of Slip Op. page 1610 is deleted, and the following inserted in lieu thereof:

> The district court's grant of summary judgment in favor of McDonough is affirmed as to the Fourth Amendment conspiracy claims.

4.   The paragraph beginning at the bottom of Slip Op. page 1619 and continuing onto page 1620 is deleted and the following inserted in lieu thereof:

> We reverse the district court's grant of summary judgment as to: (1) Michael and Aaron's Fifth Amendment claims; (2) Michael and Aaron's Fourteenth Amendment substantive due process claims; (3) all otherwise surviving claims against McDonough; (4) all otherwise surviving claims against Blum; (5) the Crowes' deprivation of familial companionship claim based on Michael's detention; and (6) the Housers' deprivation of familial companionship claim based on Aaron's detention. We affirm

the district court's grant of summary judgment as to: (1) Aaron's Fourth Amendment claim that police lacked probable cause to arrest him; (2) Michael's Fourth Amendment claim that police lacked probable cause to arrest him; (3) Michael's claim that police violated his Fourth Amendment rights by strip searching him; (4) Aaron's Fourth Amendment claim that the warrants authorizing the search of his home were not supported by sufficient probable cause; (5) the conspiracy claims against McDonough; (6) Michael and Aaron's defamation claims against Stephan; (7) Aaron's defamation claim against Blum; and (8) all claims against the Cities of Escondido and Oceanside. Additionally, we affirm the district court's denial of summary judgment as to: (1) Cheryl, Stephen, and Shannon Crowes' claims that police violated his Fourth Amendment rights by strip searching them; (2) Cheryl and Stephen's Fourth Amendment claims that the warrant authorizing police to draw blood samples was not supported by probable cause; (3) Cheryl and Stephen's Fourth Amendment claims of wrongful detention; and (4) the Crowes' deprivation of familial companionship claims based on the placement of Michael and Shannon in protective custody. We remand to the district court for further proceedings consistent with this opinion.

Each party shall bear their own costs on appeal.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

---

## OPINION

THOMAS, Circuit Judge:

This civil rights case arose from the investigation and prosecution of innocent teenagers for a crime they did not commit.

Michael Crowe, Aaron Houser, and Joshua Treadway were wrongfully accused of the murder of Michael's 12-year-old sister Stephanie Crowe. After hours of grueling, psychologically abusive interrogation—during which the boys were isolated from their families and had no access to lawyers—the boys were indicted on murder charges and pre-trial proceedings commenced.

A year later, DNA testing revealed Stephanie's blood on the shirt of a transient, Richard Tuite, who had been seen in the Crowes' neighborhood on the night of the murder and reported by several neighbors for strange and harassing behavior. The shirt had been collected as part of the initial investigation, but never fully tested. Charges against the boys were eventually dropped, and Tuite was convicted of Stephanie's murder.

Michael, Aaron, Joshua, and their families filed a complaint against multiple individuals and government entities who had been involved in the investigation and prosecution of the boys. The complaint alleged, amongst other claims, constitutional violations under the Fourth, Fifth, and Fourteenth Amendments, and defamation claims. In two separate orders, the district court granted summary judgment in favor of the defendants as to the majority of the plaintiffs' claims. The Crowes and the Housers now appeal the bulk of those orders and several defendants cross-appeal the district court's denial of summary judgment on qualified immunity grounds as to several claims. We affirm in part and reverse in part.

## I.   Facts and Procedural History

### A.   *The Crime and Initial Investigation*

On the night of January 20, 1998, police received several 911 phone calls reporting that a man—later identified as Richard Tuite—was bothering people in the neighborhood in which the Crowe family resided. Witnesses testified that Tuite

appeared drunk or high. One witness heard him yell "I'm going to kill you you fucking bitch." Another witness saw him spinning around in circles. Between 7:00 p.m. and 8:00 p.m., Tuite entered one house in the neighborhood after the occupant, Dannette Mogelinski, mistook his knock for that of a neighbor. Tuite repeatedly asked for Tracy. Mogelinski said she did not know Tracy. Tuite left, but then opened the door and again asked for Tracy. Mogelinski again said she did not know Tracy, and Tuite left. Around 7:50 p.m. Shannon Homa called 911 to report a man behaving strangely in an area near the Crowes' home. At approximately 9:28 p.m., Gary West, a neighbor of the Crowes, called 911 to report a transient who had knocked on his door and said he was looking for a girl.

Escondido police officer Scott Walters was dispatched to the area. As Officer Walters drove toward the Crowe house, he noticed a door next to the garage close. He could not see who closed the door. Officer Walters then noted in his log that the transient was "gone on arrival" and left the scene at 9:56 p.m.

Sometime between 10:00 p.m. and 11:00 p.m., 12-year-old Stephanie Crowe was stabbed to death in her bedroom. An autopsy determined that Stephanie was stabbed numerous times with a knife with a 5-6 inch blade.

Stephanie was found dead by her grandmother the next morning around 6:30 a.m. Paramedics were the first to respond to the 911 call. Defendant Escondido Police Department Detective Barry Sweeney arrived on the scene shortly thereafter. Police checked all of the doors and windows in the house and found no signs of forced entry. However, they did discover that a door leading to the master bedroom, a door located near the garage,[1] and at least one window had not been locked during the night.

---

[1]This was the same door Officer Walters saw close the night before.

Police questioned all of the members of the Crowe household at the Escondido police station in the afternoon of January 21, including Stephanie's parents, Stephen and Cheryl Crowe; Stephanie's grandmother, Judith Kennedy; Stephanie's 10-year-old sister, Shannon Crowe; and Stephanie's 14-year-old brother, Michael Crowe. The police also strip searched Michael, Stephen, Cheryl, and Shannon and photographed them nude or partially nude.[2]

Before questioning Michael, the police advised him of his *Miranda* rights. The police did not Mirandize other members of the Crowe family. Michael was interviewed by Detective Mark Wrisley, a defendant in this case. Michael told Detective Wrisley that he had gotten up at 4:30 a.m. that morning with a headache, and that he had been running a fever the day before. He described having turned on his television for light and walked to the kitchen, where he took some Tylenol. He also told Detective Wrisley that all other bedroom doors had been shut when he was in the hallway. The defendant officers testified that they considered Michael's statement that the bedroom doors were closed suspicious because by 4:30 a.m. Stephanie was dead in the doorway of her bedroom with the door open.

After police had questioned all members of the Crowe family, they decided to place Michael and Shannon in protective custody and transported them to the Polinksy Children's Center.[3]

The same day, the police located Richard Tuite and brought him to the police station so that they could talk to him, finger-

---

[2]Michael was photographed in only his underwear. Stephen was photographed completely nude. Cheryl was photographed without her underwear. Shannon was photographed without a bra.

[3]The Polinksy Children's Center is a 24-hour facility for the temporary emergency shelter of children who must be separated from their families for their own safety, or when parents can not provide care.

print him, and take samples of fingernail scrapings, hair, and clothing. At the police station, Detective Sweeney attempted to interview Tuite, but did not obtain much information. Detective Sweeney did not run a background check on Tuite. A background check would have shown that Tuite had an extensive mental health history and had been arrested multiple times on various charges. Tuite was detained for only a short period of time and then released.

B. *The Interrogations and Related Searches*

1. *Michael*

Michael was interrogated on four occasions, starting with the initial interview on January 21, 1998, at the Escondio police station. On January 22, 1998, Michael was interviewed a second time, by Detectives Wrisley and Han,[4] at the Polinksy Children's Center, where he and Shannon had spent the night after being taken into protective custody. During this interview, Michael again stated that he had woken up around 4:30 a.m., had gone to the kitchen for some Tylenol, and had thought the other doors in the hallway were closed. Michael next described waking the next morning to his parents' screams and then seeing Stephanie soaked in blood. When asked how he felt when he saw her, Michael said he cried. He described his sister as "the best person" and "kind" and expressed anger at whoever had killed her.

That same day the Escondido Police Department contacted the Oceanside Police Department to request the assistance of an officer who knew how to operate a "computer voice stress analyzer." Oceanside responded by sending one of its detectives, Christopher McDonough. When Detective McDonough arrived at Escondido, he was provided with limited information regarding Stephanie's murder.

---

[4]Detective Han was not named as a defendant in this action.

Michael was then interviewed later that day for a third time, by Detectives McDonough and Claytor. This interview lasted more than three hours and took place at the Escondido Police Station. At the beginning of the interview, Michael indicated that he felt sick. Michael then repeated the same series of events for the evening of January 20 and the morning of January 21 that he had recounted in the first two interviews. Detective Claytor then asked Michael if he would be willing to take "a truth verification exam." Michael responded that he would be willing, but added:

> I feel like I just . . . I spent all day away from my family. I couldn't see them. . . . I feel like I'm being treated like I killed my sister, and I didn't. It feels horrible, like I'm being blamed for it. Everything I own is gone . . . Everything I have is gone. Everything. You won't even let me see my parents. It's horrible.

Detective McDonough then entered the room and took over the interview.

After Michael recounted the same series of events and again expressed how stressful the past two days had been, McDonough introduced the computer stress voice analyzer. McDonough told Michael the stress voice analyzer "was controlled by the government for a long time, okay, because it was so accurate."

Detective McDonough asked Michael a long series of "yes or no" questions, including both control questions and questions specific to Stephanie's death. McDonough then reviewed the results with Michael and told him that the test "showed that you had some deception on some of the questions." McDonough asked him, "Is there something, though, that maybe you're blocking out . . . in your subconscious mind that we need to be aware of?" McDonough pressured

Michael about whether there was something Michael needed to confess, which Michael repeatedly denied.

At this point Detective Claytor took over the interview. Claytor told Michael they found blood in his room, lifted fingerprints off the blood stains, and that the police now knew who killed Stephanie. Then he told Michael:

> We can't bring her back. I'll tell you what we can do. What we can do is the right thing by Stephanie's name and by yourself and by your parents. Okay. Now, there is a couple of things that we need your help with . . . that only you're going to be able to help us with. . . . What I'd like you to do right off the bat, rather than put our team through any more, can you tell me what you did with the knife?

Michael responded: "What—God. I don't—no. I don't know. I didn't do it. I swear to God." Claytor continued to insist Michael killed Stephanie and Michael continued to deny it. Claytor also repeatedly told Michael that he wasn't a bad person and that they wanted to help him.

Claytor next introduced the idea that Michael killed Stephanie but did not remember it. Michael started repeating over and over that he didn't remember doing anything. He also asked Claytor if he was sure Michael had done it, to which Claytor responded, "I'm sure about the evidence. Absolutely." At this point Claytor left and McDonough resumed the interview. As Claytor left Michael sobbed, "God. God. Why? Why? Why? Oh, God. God. Why? Why? I don't deserve life. I don't want to live. I can't believe this. Oh, God. God. Why? Why? How could I have done this? I don't even remember if I did it." When McDonough entered the room, Michael continued to state that he didn't remember and asked "How can I not remember doing something like that? That's not possible." The interview ended shortly thereafter.

Michael was interviewed for a fourth and final time the following day, January 23, 1998, by Detectives Wrisley and Claytor. Prior to the interview, police contacted Dr. Lawrence Blum, a clinical psychologist, and asked him to consult with them during the interview. Dr. Blum was briefed by police, watched portions of the videos of Michael's previous interviews, and then observed the fourth interview from a monitoring room. Dr. Blum commented on Michael's demeanor, personality, and responses to questions. The interview lasted more than six hours.

During the interview Detectives Wrisley and Claytor took turns interrogating Michael. They employed a variety of tactics in an attempt to extract a confession from him. The first approach they took—which they repeated throughout the interview—was to tell Michael that they had evidence to prove he had killed his sister. They told him again that they found blood in his room, that they knew Michael had moved Stephanie, that they had proof that no one had entered the house and so Stephanie had to have been killed by a family member, and that they found blood in the bathroom sink.

Claytor told Michael that they were going to play a game, in which they would talk about the evidence and Michael would explain it. They started with the blood Claytor said was found in Michael's room. When Michael said he didn't know how to explain it because he didn't know how it got there, Claytor told him that under the rules of the game Michael wasn't allowed to say "I don't know." As Claytor continued to push Michael, Michael gave responses such as "How am I supposed to tell you an answer that I don't have? I can't— it's not possible to tell you something I don't know," and "You keep asking me questions I can't answer. What do you want me to do? Make something up? Lie to you?"

Later, Wrisley tried to get Michael to describe stabbing Stephanie:

Q. What did you do?

A. I don't know. All I know that I did is what you told me. That's all I know.

Q. What did we tell you that you did?

A. You told me that I killed her.

Q. How?

A. I don't know. You asked me what I did with the knife, so I assume it was a knife. That's all I know.

Q. So what does the knife do? What's the knife got to do with it?

A. He asked me if I—what I did with the knife, but I can't—I don't know. That's all I know.

Q. Well, if there was a knife there and Stephanie was dead, what role did the knife play?

A. I don't know. They thought I killed her.

Q. How?

A. I don't know.

Q. Oh, come on, Michael.

A. I don't know. God.

Q. You played enough of these games. You know how the knives work.

A. They cut her.

Q. Is that a question?

A. I don't know. I can't really tell you.

Q. You know how knives work, Michael. That's a little insulting to say that in front of Ralph and I who investigate these cases all the time. Right?

A. I guess.

Q. You guess?

A. I don't know for sure. I guess it would be.

Q. So how is a knife used to kill somebody?

A. Maybe stab them.

Q. Where?

A. I don't know.

Q. Well, where would you think? If someone was going to die from being stabbed, where would they be stabbed?

A. In the head.

Q. Okay. Where else? Is that the only place?

A. Stomach. I don't know. The chest.

Q. The chest, in the head?

A. Yeah.

Q. Would they die from being stabbed in the stomach?

A. Eventually.

Q. Eventually?

A. Yes.

Q. Why?

A. They'd bleed to death.

Q. Would they?

A. I guess. I don't know.

Q. Well, are you basing that on some kind of ratio-nale or are you just taking a flier out of it?

A. I told you. I don't remember what I did. I don't care if you think I'm just trying not to tell you. I don't care.

The detectives also followed up on the idea that Claytor had introduced the day before: that Michael had killed his sister but did not remember. Throughout the entire 6-hour interview Michael repeatedly asserted that he did not remember killing his sister, to which the detectives insisted, "I'm helping you remember," and "I think you don't want to remember."

Earlier in the interview, Wrisley had also introduced the idea that there were "two Michaels," a "good Michael" and a "bad Michael":

Q. Once everybody understands what's been going on, I know that people will be able to forgive, Michael.

A. But I didn't do it.

Q. You know, the good part of Michael didn't do it.

A. I didn't.

Q. The Michael that helps her with her math.

A. I didn't. I didn't do this.

Q. And I'm suggesting to you, Michael, that the Michael that has an opponent to defeat who has an incredible assortment of things at his disposal could be responsible for this.

A. No. It's not true. I didn't do this.

Q. Help me understand, Michael.

A. I didn't do this.

When Claytor took over the interview, he continued with the theme of "two Michaels" and told him that people would understand, and that he wouldn't be held "to the same standards" because he was only 14. Michael eventually started to be influenced by the "two Michaels" theory, as is evident from his response to the following question:

Q. — what's your greatest fear right now? What's the worst that you can imagine right now?

A. I'm afraid that there is someone else inside of me. I don't know who they are. I don't know what they do. I don't—if what you're saying is true, then it's like there is another person in me then. I don't remember anything.

Finally, the detectives began to tell Michael that if he confessed he would get help rather than go to jail. This was the

tactic that seems to ultimately have proved the most "effective." Claytor told Michael:

> Q. I'm not real sure how familiar you are with the system, but kind of the way it works is if the system has to prove it, yeah, it's jail. If they don't, then it's help. What that kinds of puts—or where that kind of puts us is in a position of you have these two roads to go. Which one are we going to go down?
>
> A. I told you.
>
> Q. What I'm really afraid of is that we're going down the make the system prove it. And I know you're smart enough to know that that can be done quite easily.

Michael responded, "If I told you right now, I would be lying. You'd find out eventually. The evidence would say it's a (unintelligible). My story would be wrong. Then what would happen to me?"

But the detectives persisted and ultimately Wrisley extracted the following from Michael:

> Q. Tell us.
>
> A. If I tell you a story, the evidence is going to be a complete lie.
>
> Q. Well, then, tell us the story.
>
> A. Well, I'll lie. I'll have to make it up.
>
> Q. Tell us the story, Michael.
>
> A. You want me to tell you a little story?

Q. Tell us the story. What happened that night?

A. Okay. I'm going to warn you right now. It is a complete lie.

Q. Tell us the story.

A. Okay. This is true. I am extremely jealous of my sister.

Q. Okay.

A. She's always had a lot of friends and good friends and stuff like that. She was friends with people my age, all the popular girls and stuff like that. That's true. Okay.

. . .

A. Okay. Here is the part where I'll start lying. That night I thought about her. I couldn't take it anymore. Okay. So I got a knife, went into her room and I stabbed her. I left her on her bed, picked her up off the bed, dropped her.

. . .

Q. How many times did you stab her?

A. It's going to be a lie. Three times.

. . .

Q. Tell me what the truth is.

A. The only reason I'm trying to lie here is because you presented me with two paths. I'd rather die than go to jail.

The detectives latched onto Michael's story as a confession. Throughout the remainder of the interview they tried to fill some of the holes in his story—including where he got the knife and what he did with it afterwards—but Michael was unable to give them any further information. At the end of the interview Michael said, "Like I said, the only way I even know I did this because she's dead and because the evidence says that I did. You could find someone else did it—and I pray to God someone else did. I think it's too late for that. I think I did it."

## 2. *Aaron*

Police first contacted Aaron Houser at his home on January 22, 1998. Aaron answered the door and said his parents were not home. The police then interviewed Aaron for 30 to 45 minutes regarding his friendship with Michael.

Aaron was interviewed a second time on January 27, 1998, by Detective Wrisley at the Escondido police station. The interview lasted approximately two hours. The interview primarily focused on Aaron's perception of Michael's relationship with his family. Wrisley asked Aaron whether Michael ever talked about hurting his family and whether Aaron thought Michael could have killed his sister. Aaron said he didn't think so. Aaron also told Wrisley that he had discovered that day that a knife he owned was apparently missing.[5]

On February 11, 1998, police arrested Aaron at his school and searched his home and locker. After arresting him, the police strip searched him, and then interrogated him for approximately 9.5 hours at the Escondido police station. He was interrogated, primarily by Detective McDonough, but also by defendants Sweeney, Wrisley, and Claytor.

---

[5]Aaron had a collection of knives. His mother had reported to the police earlier that day that she noticed that one of his knives was missing.

   In interrogating Aaron, the detectives used tactics similar to those they used against Michael. McDonough began the interrogation with the stress voice analyzer, describing it has he had for Michael. Eventually he began to ask Aaron to "theoretically" describe how he, Michael, and Joshua would each respectively kill Stephanie, if they were going to do so. McDonough suggested details to the story, through questions regarding what clothing Aaron would wear and how he would get rid of it, whether he would wear gloves, what time he would pick, and how he would get into the house. Later, McDonough told Aaron that Joshua and Michael had both said Aaron helped them kill Stephanie. Aaron denied it. Then McDonough told Aaron that the computer stress voice analyzer indicated that he was definitely involved. At this point Aaron began to even more vehemently protest his innocence:

> A. Let me put it this way: I don't know anything. I don't know who did. I don't know a single thing. I'm doing my best to tell the truth.
>
> Q. Aaron, calm down.
>
> A. I'm telling the truth to the best of my ability.
>
> Q. Calm down.
>
> A. How can I calm down? I'm being accused of murder?
>
> Q. Relax, Aaron.
>
> A. How?
>
> Q. Relax.
>
> A. How? Relax how?
>
> . . .

Q. You need to help yourself in the situation here, son.

A. What do I do?

Q. Tell the truth.

A. I did and you said I lied.

Q. Yes.

A. Okay.

Q. You lied. You have lied.

McDonough also told Aaron they had physical evidence against him and implied that they would soon uncover more.

When Detective Claytor took over the interview he began to tell Aaron how much easier things would be for him if he confessed:

Q. Here's the situation. You put us into a position by saying "Don't know what you're talking about. This is all bogus. Wasn't me. Didn't do it." It's what we call "The other dude did it."

A. Uh-huh.

Q. Now what that does is it puts you in kind of a bad light, because at some point you may face a jury of average everyday citizens right off the street out here. . . .

A jury has a real difficult time convicting people of crimes, especially of this nature. Why? Because they don't want to believe that a person would do this. So what they do is deny away the evidence and

look at the evidence and they say, "Good grief. How can he possibly sit here and say he didn't do it, because look what we have? We have this evidence, this evidence . . .

They want to see an apology. They want to see someone who is willing to accept what's occurred.

. . .

Q. Now, two ways to go. You can force me to make you live with your denial, which I'll do. No problem at all. Or you can put me in a position to where I can write on a piece of paper, "We have a 15-year-old man here who made a very serious mistake. He's willing to talk to me, though. He's willing to fix it."

Aaron maintained his innocence through the end of the 9.5 hour interrogation, at which point the detectives arrested him and read his *Miranda* rights for the first time.

### 3. Joshua[6]

On January 22, 1998, police went to Joshua Treadway's house to interview him. Joshua answered the door and said that his parents were not at home. After entering the house, the police noticed a knife on the couch. Joshua said the knife belonged to his brother, though his brother later said it belonged to Joshua. The police asked Joshua questions about Michael and his friendship with Michael. The interview lasted approximately one hour.

On January 27, 1998, police searched the Treadway house and recovered a knife, which Aaron later identified as the knife he had reported missing. That day, Joshua was interro-

---

[6]Although the Treadways were parties in the district court, they are not parties to this appeal.

gated for approximately 13.5 hours. The interview began around 7:00 p.m. at Joshua's home, continued around 9:00 p.m. at the Escondido police station, and concluded around 8:30 a.m. Joshua was interrogated by Detectives Claytor, Sweeney, and McDonough. Joshua was never Mirandized during the course of the interrogation.

The detectives employed similar techniques as they had during the interrogations of Michael and Aaron. Detective Claytor alternated between promising Joshua leniency and threatening him with punishment. Detective McDonough took over around 3:00 a.m. and used the computer stress voice analyzer, describing the device to Joshua in the same way as he had to Michael and Aaron. Detective McDonough's portion of the interview continued for several hours and he repeatedly denied Joshua's requests for sleep. Ultimately Joshua broke down and told McDonough that Aaron had given him the knife used to kill Stephanie. At this point, McDonough told him that the stress voice analyzer device indicated that he had "passed."

On January 31, 1998, Detectives Claytor and Anderson convinced Joshua to call Aaron and accuse him of complicity in Stephanie's murder while they monitored the call. Aaron denied any involvement.

On February 10, 1998, Joshua was interrogated a third time for approximately 12 hours, with a two-hour break, at the Escondido police station, by Detectives Claytor and McDonough, with the consultation of Dr. Blum. The detectives again used similar techniques and ultimately Joshua gave a more in-depth confession, which, although detailed, was both internally inconsistent and inconsistent with other information the police had at their disposal. At the conclusion of the interview, the police arrested Joshua and Mirandized him for the first time.

## C.　*Pre-Trial Proceedings*

Statements obtained from the boys during their interrogations were introduced during at least three pre-trial proceedings. First, in April 1998, a "*Dennis H.* Hearing,"[7] was held and resulted in Aaron and Joshua spending several months in jail while awaiting trial.[8] The boys' statements were introduced. The statements were next introduced during the grand jury proceedings in May 1998. On May 22, 1998, the grand jury issued indictments against the three boys for murder and conspiracy to commit a crime. Finally, in July 1998, a "707 Hearing"[9] was held to determine if the boys would be tried as juveniles or adults. The boys' statements were again introduced.

On December 17, 1998, the state court held a suppression hearing in which the court considered, amongst other motions in limine, the defense's motions to suppress the three boys' statements. The court suppressed the majority of Michael's third interrogation and all of his fourth interrogation on the ground of coercion. The court found that starting early in the third interrogation, "there was commenced a coercive scheme, whether intentional or unintentional; it culminated in the adoption of what we have come to refer to as the 'good Michael, bad Michael' approach. Where, in essence, the defendant, Mr. Crowe, was told if he confessed, if he provided information, he would receive treatment." The court suppressed all of Aaron's statements on the ground that Aaron

---

[7]Under California law, when a minor is taken into custody by a police officer, he must be released within 48 hours from the time of his apprehension, unless within that time a petition is filed in the juvenile court or a criminal complaint is filed with a court of competent jurisdiction explaining why the minor should be declared a ward of the court. *See* Cal. Welf. & Inst. Code § 631. Such a hearing is called a "*Dennis H.* Hearing." *See In re Dennis H.*, 19 Cal. App. 3d 350, 354 (Cal. App. 1971).

[8]The record is unclear as to when Michael was incarcerated.

[9]A "707 Hearing" is held to determine whether a minor should be tried in juvenile or adult court. *See* Cal. Welf. & Inst. Code § 707.

had not been Mirandized. Finally, the court suppressed Joshua's second interrogation on the ground of coercion and the pre-arrest portion of his third interrogation on the ground that he had not been Mirandized. The court then set a trial date in January 1999.

### D.   *Dismissals of Indictments and Prosecution of Tuite*

On October 27, 1998, pieces of Tuite's clothing, which had been collected when police first interviewed Tuite on January 21, 1998, were sent to a laboratory for forensic testing, at the joint request of Joshua Treadway's defense attorney and the prosecution. The clothing included the long-sleeved red shirt Tuite had been wearing when police brought him in for questioning on January 21, 1998.[10] On January 14, 1999, the forensic laboratory notified the prosecution that DNA results showed that Tuite's red shirt contained spots of Stephanie Crowe's blood. On February 25, 1999, the prosecution filed a Motion to Dismiss the indictments against the boys.

Tuite was eventually charged and tried for Stephanie Crowe's murder. On May 26, 2004, a jury convicted Tuite of voluntary manslaughter.

### E.   *§ 1983 Action*

After the charges against them were dismissed, the boys and their families[11] filed three separate complaints in state court alleging violations of 42 U.S.C. § 1983 and various state-law torts. The defendants removed the complaints to federal court, and the district court consolidated the actions and ordered the plaintiffs to file a joint complaint. The plain-

---

[10]Tuite's clothing had apparently been examined previously in April of 1998, but visual inspections did not detect any blood on Tuite's red shirt.

[11]Michael, Stephen, Cheryl, Judith Ann, and Shannon Crowe; Aaron, Margaret Susan, and Gregg Houser; and Joshua David, Zachary, Michael Lee, and Tammy Treadway.

tiffs filed their Joint First Amended Complaint on April 24, 2000. The following defendants are parties to this appeal: the City of Escondido and Escondido Police Detectives Mark WRISLEY, Phil Anderson, Barry Sweeney, and Ralph CLAYTOR (collectively "the Escondido defendants"); the City of Oceanside and Oceanside Police Detective Chris McDonough (collectively "the Oceanside defendants"); Dr. Lawrence Blum; and Assistant District Attorney Summer Stephan.

The Escondido defendants filed a motion to dismiss, which was granted in part on July 26, 2000. Defendants then filed multiple motions for summary judgment on qualified immunity grounds. The district court granted portions of these motions on February 17, 2004. *Crowe v. County of San Diego*, 303 F. Supp. 2d 1050 (S.D. Cal. 2004) ("*Crowe I*"). The Escondido defendants subsequently filed motions for summary judgment, again on qualified immunity grounds, as to the remainder of the claims pending against them. The district court granted those motions, in part, on February 28, 2005. *Crowe v. County of San Diego*, 359 F. Supp. 2d 994 (S.D. Cal. 2005) ("*Crowe II*").

The Crowes and the Housers appeal the district court's grant of summary judgment, on qualified immunity grounds, as to (1) Michael and Aaron's Fifth Amendment claims, (2) Michael and Aaron's Fourteenth Amendment substantive due process claims, (3) Michael and Aaron's various Fourth Amendment claims, (4) the Crowes' and Housers' Fourteenth Amendment deprivation of familial companionship claims, (5) Michael and Aaron's defamation claims, and (6) the Crowes' and Housers' claims of municipal liability against the City of Escondido and the City of Oceanside.

The Escondido defendants cross-appeal the district court's denial of summary judgment, on qualified immunity grounds, as to (1) Fourth Amendment claims stemming from the nude photographing of Cheryl, Stephen and Shannon Crowe, (2)

Fourth Amendment claims stemming from the taking of blood samples from Cheryl and Stephen Crowe, (3) Fourth Amendment claims stemming from the detention of Cheryl and Stephen Crowe, and (4) the Crowes' Fourteenth Amendment deprivation of familial companionship claim based on the placement of Michael and Shannon Crowe in protective custody.

Defendants asserted qualified immunity in each of their summary judgment motions. To determine whether a government employee is entitled to qualified immunity, we use a two-part test. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, we must determine whether, viewed in the light most favorable to the plaintiff, the government employees violated the plaintiff's constitutional rights. *Id.* Then, if we determine that a constitutional violation has occurred, the court must determine whether the rights were clearly established at the time of the violation. *Id.* For each claim on which the district court granted summary judgment, the district court held that there was no constitutional violation, but that even if there was a violation, it was not clearly established.

We review de novo a district court's decision to grant or deny summary judgment on the ground of qualified immunity. *Motley v. Parks*, 383 F.3d 1058, 1062 (9th Cir. 2004). We must view the evidence "in the light most favorable" to the plaintiffs to determine if there was no genuine issue as to any material fact and whether the defendants were entitled to judgment as a matter of law. *Mueller v. Auker*, 576 F.3d 979, 991 (9th Cir. 2009). In doing so, all justifiable inferences are to be drawn in favor of the plaintiffs. *Id.*

## II. Fifth Amendment Claims

[1] Michael and Aaron allege that defendants Blum, Wrisley, Sweeney, Claytor, McDonough, and Anderson violated their Fifth Amendment privilege against compelled self-incrimination. The district court granted summary judgment

in favor of defendants, relying primarily on its interpretation of *Chavez v. Martinez*, 538 U.S. 760 (2003). *Crowe I*, 303 F. Supp. 2d at 1091-93; *Crowe II*, 359 F. Supp. 2d at 1030. Prior to *Chavez*, the rule in our Circuit was that a § 1983 cause of action for a violation of the Fifth Amendment's Self-Incrimination Clause arose as soon as police employed coercive means to compel a statement. *See Cooper v. Dupnik*, 963 F.2d 1220, 1242 (9th Cir. 1992). In *Chavez*, the Supreme Court held that mere coercion does not create a cause of action under § 1983 for a violation of the Self-Incrimination Clause, absent use of the compelled statement in a criminal case.

As we have recently held, however, *Chavez* does not preclude § 1983 claims for Fifth Amendment violations when the coerced confession is used in certain pre-trial proceedings. *See Stoot v. City of Everett*, No. 07-35425, 2009 WL 2973229, at *13 (9th Cir. Sept. 18, 2009). Because statements obtained during Michael's and Aaron's interrogations were used in pre-trial proceedings of the type discussed in *Stoot*, namely the "*Dennis H.*" hearing, the grand jury proceedings, and the 707 hearing, we must reverse the district court's grant of summary judgment.

A

We begin with *Chavez*, which provides the underpinnings of our analysis. *Chavez* involved a § 1983 case arising out of the coerced confession of Oliverio Martinez. Two police officers became involved in an altercation with Martinez and one of the officers ultimately shot Martinez several times, causing severe injuries including blindness and paralysis. *Chavez*, 538 U.S. at 764. The officers then arrested Martinez and sent him to a hospital with paramedics. *Id.* At the hospital, another officer, Chavez, questioned Martinez while he was receiving medical treatment. *Id.* During the questioning, Martinez was in severe pain and stated several times that he was dying. *Id.* at 784-86 (Stevens, J., concurring in part and dissenting in

part). Martinez was never *Mirandized* and was never ultimately charged with a crime. *Id.* at 764.

Martinez filed suit under § 1983, alleging that the questioning violated his Fifth Amendment right to be free from compelled self-incrimination, as well as his Fourteenth Amendment substantive due process rights. *Id.* at 764-65. The district court granted summary judgment in favor of Martinez as to Chavez's qualified immunity defense, and we affirmed. *Martinez v. Oxnard*, 270 F.3d 852 (9th Cir. 2001). The Supreme Court reversed. Both Justices Thomas and Souter authored opinions supporting the judgment as to the Fifth Amendment question; neither garnered a majority of the Court.

Announcing the judgment of the Court, Justice Thomas noted that the text of the Fifth Amendment protects a person from being "compelled *in any criminal case* to be a *witness* against himself." *Chavez*, 538 U.S. at 766 (quoting U.S. Const. amend. V). Justice Thomas opined that "criminal case" does not encompass the entire criminal investigatory process, and "at the very least requires the initiation of legal proceedings." *Id.* However, the opinion stopped short of defining "criminal case." *Id.* at 766-67 ("We need not decide today the precise moment when a 'criminal case' commences; it is enough to say that police questioning does not constitute a 'case.' ").

The opinion concluded that Martinez had no cause of action under the Fifth Amendment, because "it is not until [the compelled statements'] use in a criminal case that a violation of the Self-Incrimination Clause occurs." *Id.* at 767. Martinez's statements were not used in any criminal proceeding.

Justice Souter's opinion discussed the scope of the Fifth Amendment's Self-Incrimination Clause and concluded that Martinez did not state a § 1983 cause of action for a Fifth Amendment violation. However, Justice Souter presented a

different analysis as to why Martinez did not have a cause of action. Justice Souter opined that the mere fact that Martinez's statements were not used in a "criminal case" is not enough to doom his claim. *Id.* at 777. While the "core of Fifth Amendment protection" concerns the use of a compelled statement in a criminal case, the Fifth Amendment also protects in situations where "the core guarantee, or the judicial capacity to protect it, would be placed at some risk in the absence of such complementary protection." *Id.* at 777-78. This is why, Justice Souter explained, the Fifth Amendment also provides protection in "non-core" situations such as compelled testimony in a civil case. *Id.* (*citing McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924)).[12]

**[2]** Recently, we have clarified "the precise moment when a 'criminal case' commences." In *Stoot*, we held that "[a] coerced statement has been 'used' in a criminal case when it has been relied upon to file formal charges against the declarant, to determine judicially that the prosecution may proceed, and to determine pretrial custody status." *Stoot*, 2009 WL 2973229, at *13.

B

With that background, we consider the procedural posture in the instant case. In granting summary judgment for defendants, the district court concluded that Michael and Aaron's Fifth Amendment claims failed for two reasons. First, the district court interpreted *Chavez* to require that a compelled statement be introduced in a criminal trial in order to create a Fifth Amendment cause of action. *Crowe I*, 303 F. Supp. 2d at 1091. Second, the district court concluded that a Fifth Amendment cause of action can *never* arise against a police

---

[12]Part II of Justice Souter's opinion, which was the only part of any of the six opinions joined by a majority of the Court, held that Martinez might be able to pursue a claim for violation of his substantive due process rights and remanded on that issue.

officer, because the harm is the introduction of the statement at trial and the police officer will never be the proximate cause of that harm. *Id.* at 1091-92. The district court did not have the benefit of *Stoot* when issuing its opinion. Nevertheless, *Stoot* makes clear that the district court erred in both conclusions. We thus reverse the grant of summary judgment as to Michael and Aaron's Fifth Amendment claims.[13]

[3] In contrast to the facts in *Chavez*, the prosecution of Michael and Aaron did not cease with the boys' interrogations. Rather, the boys were indicted and the case against them continued for a year, up and until the eve of trial. During this time, statements obtained during the boys' interrogations were used in several pre-trial proceedings, including a "*Dennis H.* Hearing," the grand jury proceedings, and a "707 Hearing." Following *Stoot*, we hold that the use of Michael's and Aaron's statements in the pre-trial proceedings gives rise to a Fifth Amendment cause of action.

[4] All three pre-trial proceedings in which Michael and Aaron's statements were used gave rise to a Fifth Amendment cause of action. The "707 hearing" was held to determine whether the boys would be incarcerated in Juvenile Detention prior to trial. Pre-trial incarceration is a deprivation of liberty and an important part of any "criminal case."

[5] A grand jury proceeding is at the heart of a "criminal case." Without an indictment, there is no trial. In considering a similar question, albeit in a different context, the Supreme Court held that the Fifth Amendment applies in the grand jury context even if the evidence is not used at trial. *United States v. Hubbell*, 530 U.S. 27, 41 (2000). In *Hubbell*, the Court considered whether the use of documents, produced by a defendant pursuant to a subpoena, to obtain an indictment against that defendant violated his Fifth Amendment right to be free from self-incrimination. The Court held that it did, *id.* at 41,

---

[13]See *infra* Part VIII.B for discussion of the claims against Blum.

and held that the documents need not be introduced at trial to complete the Fifth Amendment violation, *id.* at 43. The government had argued that it would not need to introduce the documents used to indict in the actual trial and that the defendant's Fifth Amendment rights would therefore never be violated. The Court firmly rejected that argument: "In sum, we have no doubt that the constitutional privilege against self-incrimination protects the target of a grand jury investigation from being compelled to answer questions designed to elicit information about the existence of sources of potentially incriminating evidence." *Id.* at 43. Applying *Hubbell* in this context leads to a similar conclusion.

**[6]** Finally, a "*Dennis H.* hearing" is yet another important part of a "criminal case." The outcome of such a hearing is not merely a choice of venue, but a determination of maximum punishment. As the California Supreme Court has noted, "the certification of a juvenile offender to an adult court has been accurately characterized as 'the worst punishment the juvenile system is empowered to inflict.' " *Ramona R. v. Superior Court*, 37 Cal. 3d 802, 810 (1985) (quoting Note, *Separating the Criminal from the Delinquent: Due Process in Certification Procedure*, 40 S. Cal. L. Rev. 158, 162 (1967)).[14] Thus, all of the pre-trial proceedings in which plaintiffs' Fifth Amendment rights were violated give rise to § 1983 claims.

The district court also granted summary judgment on the ground that Michael and Aaron's Fifth Amendment claims failed because the police officer defendants were not the proximate cause of the harm. *Crowe I*, 303 F. Supp. 2d at 1091-92. The court reasoned that harm only arises when a coerced statement is admitted in court, whether during a trial or pre-trial proceeding. Thus, "it cannot be said that a police officer

---

[14]Michael additionally argues that the use of his statements at Tuite's trial creates a cause of action. This argument has no merit because Michael's liberty was neither infringed nor threatened by the use of his statements in Tuite's trial.

is the proximate cause of such a violation . . . [because] it is the prosecutor, not the police officer, who decides to introduce and actually introduces the statement into evidence. Moreover, . . . it is the trial judge who ultimately determines whether the statement will be admitted." *Id.* at 1091. This conclusion is foreclosed by our decision in *Stoot*. *See* 2009 WL 2973229, at *13-*14.

The district court's reasoning would effectively bar *any* § 1983 action for a violation of the Self-Incrimination Clause. A police officer will never "actually introduce[ ] the statement into evidence" and prosecutors and judges have absolute immunity for any act performed in their prosecutorial and judicial capacities. *See Stump v. Sparkman*, 435 U.S. 349 (1978) (judicial immunity); *Imbler v. Pachtman*, 424 U.S. 409 (1976) (prosecutorial immunity). Such a rule is in direct conflict with "[t]he purpose of § 1983 [which] is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000). If a plaintiff could *never* bring a § 1983 action for a violation of the Self-Incrimination Clause, the statute would be robbed of its purpose.

Further, in the context of § 1983 claims, we have explained that "[t]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978). When a police officer questions a suspect, he knows that any statement the suspect gives may be used to prosecute that suspect. *A fortiori*, he knows that an obtained *confession* will almost certainly be used to prosecute. Thus, while the officer may not actually introduce the statement into court, coercing the confession "set[s] in motion a series of acts by others which the [officer] knows or reasonably should know would cause" the statement to be introduced. *See Stoot*, 2009 WL 2973229, at

*14 ("Like the other circuits to address this question, we conclude that, absent unusual circumstances, a police officer eliciting incriminating statements from a criminal suspect 'could reasonably have foreseen that a coerced confession would be used against [the suspect] and would lead to [the suspect's] detention.' " (quoting *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007) (alterations in original))). The defendants were unquestionably a proximate cause of the violations of Michael and Aaron's Fifth Amendment rights.

**[7]** In summary, we hold that a Fifth Amendment cause of action against the relevant defendants arose when Michael and Aaron's coerced statements were introduced against them during pre-trial proceedings.

**[8]** Further, the defendants are not entitled to qualified immunity. In 1998, when defendants interrogated Michael and Aaron, the clearly established rule in this Circuit was that a § 1983 cause of action for a violation of the Fifth Amendment's Self-Incrimination Clause arose as soon as police employed coercive means to compel a statement. *See Cooper*, 963 F.2d at 1242; *see also Stoot*, 2009 WL 2973229, at *14-15) (denying qualified immunity for a similar claim). As such, defendants cannot claim the protection of qualified immunity. *See Saucier*, 533 U.S. at 201.

### III. Substantive Due Process Claims

**[9]** The Due Process Clause of the Fourteenth Amendment protects against any government conduct that "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). Michael and Aaron allege that defendants Blum, Wrisley, Sweeney, Claytor, McDonough, and Anderson violated their Fourteenth Amendment substantive due process rights by using interrogation techniques so coercive as to "shock the conscience." The district court granted summary judgment for defendants, concluding that the defendants' actions did not

"shock the conscience." *Crowe I*, 303 F. Supp. 2d at 1096; *Crowe II*, 359 F. Supp. 2d at 1034.

We have previously explained that police conduct need not include physical violence to violate substantive due process. *See, e.g.*, *Cooper*, 963 F.2d at 1249-50, *abrogated on other grounds by Chavez*, 538 U.S. at (holding that police interrogation plan to ignore suspect's requests for an attorney and relentlessly interrogate him violated the suspect's substantive due process rights); *Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir. 1989) ("While brutality by police or prison guards is one paradigmatic example of a substantive due process violation, it does not exhaust the possibilities."). It has also long been established that the constitutionality of interrogation techniques is judged by a higher standard when police interrogate a minor. *See In re Gault*, 387 U.S. 1, 55 (1967) (In an interrogation of a minor, "the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.").

The Crowes and the Housers presented testimony from several expert and lay witnesses in support of their argument that the interrogations of Michael and Aaron violated the boys' substantive due process rights. Dr. Richard Leo, an expert in coerced confessions, described Michael's interrogation as "the most psychologically brutal interrogation and tortured confession that I have ever observed." Dr. Calvin Colarusso, Director of Child Psychiatry Residence Training Program at the University of California, San Diego, conducted a psychiatric evaluation of Michael and characterized his interrogation as "the most extreme form of emotional child abuse that I have ever observed in my nearly forty years of observing and working with children and adolescents." Robert Puglia, former Chief Deputy District Attorney for Sacramento County, testified in a sworn declaration that Michael's statements were the product of a "coercive police scheme." And finally, a juror

in Tuite's criminal trial, who viewed the videotapes of the boys' interrogations, described the interrogations as "brutal and inhumane" and "psychological torture."

**[10]** One need only read the transcripts of the boys' interrogations, or watch the videotapes, to understand how thoroughly the defendants' conduct in this case "shocks the conscience." Michael and Aaron—14 and 15 years old, respectively[15]—were isolated and subjected to hours and hours of interrogation during which they were cajoled, threatened, lied to, and relentlessly pressured by teams of police officers. "Psychological torture" is not an inapt description. In *Cooper*, we held that police violated an *adult* suspect's substantive due process rights when they "ignored Cooper's repeated requests to speak with an attorney, deliberately infringed on his Constitutional right to remain silent, and relentlessly interrogated him in an attempt to extract a confession." 963 F.2d at 1223. The interrogations of Michael and Aaron are no less shocking. Indeed, they are more so given that the boys' interrogations were significantly longer than Coopers's,[16] the boys were minors, and Michael was in shock over his sister's brutal murder. The interrogations violated Michael's and Aaron's Fourteenth Amendment rights to substantive due process.

**[11]** Further, defendants are not entitled to qualified immunity because it was clearly established, at the time of the boys' interrogations, that the interrogation techniques defendants chose to use "shock the conscience." Defendants had the benefit of this Court's holding in *Cooper*, as well as Supreme Court case law directing that the interrogation of a minor be conducted with "the greatest care," *In re Gault*, 387 U.S. at 55. Just as in *Cooper*, here, "[q]ualified immunity is manifestly inapplicable." 963 F.2d at 1251.

---

[15]Aaron was interrogated on his fifteenth birthday.

[16]Cooper was interrogated once for four hours. *Cooper*, 963 F.2d at 1237. Michael was interrogated four times and Aaron was interrogated twice, each for over 10 hours.

## IV. Probable Cause Claims

### A. *Michael's Arrest*

Michael was arrested on January 23, 1998, after his fourth and final interrogation. *Crowe I*, 303 F. Supp. 2d at 1059. Michael alleges that, considering all information known to the officers at the time of his arrest, there was no probable cause to arrest him. The district court granted summary judgment in favor of defendants. *Crowe II*, 359 F. Supp. 2d at 1007. We affirm the district court on the alternate grounds that the defendants were entitled to qualified immunity as to this claim.

[12] "Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has committed . . . an offense." *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir. 1990) (internal quotation marks omitted). In determining whether there was probable cause to arrest, we look to "the totality of circumstances known to the arresting officers, [to determine if] a prudent person would have concluded there was a fair probability that [the defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986). While evidence supporting probable cause need not be admissible in court, it must be "legally sufficient and reliable." *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002). As we have discussed, *see supra* Parts III and IV, the interrogations of Michael violated his Fifth and Fourteenth Amendment rights. As the district court properly concluded, such coerced confessions are legally insufficient and unreliable and thus cannot factor into the probable cause analysis.

Excluding Michael's coerced statements, at the time of Michael's arrest, police had the following information which could support a theory that Michael was responsible: (1) Michael stated he thought Stephanie's door was closed at a

time—4:30 a.m.—when the officers could reasonably believe her body was lying in her doorway blocking the door;[17] (2) no one else in the house heard anyone enter or exit the house during the night;[18] and (3) the family dog did not bark during the night. *Crowe II*, 359 F. Supp. 2d at 1007-17. On the other hand, the police also had the following information which suggests that someone other than Michael could have been responsible: (1) eye witness accounts had placed Richard Tuite in the Crowe's neighborhood and described him as loud, drunk or high, agitated, and knocking on doors looking for "Tracy"; (2) just before 10:00 p.m. an officer investigating the complaints about Tuite saw a door to the Crowe house shut but did not see who shut it; (3) the Crowe family reported that everyone was in bed before 10:00 p.m.; (4) an outside door to the master bedroom and the window in Stephanie's room were not locked during the night. Although "police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause." *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005).

We decline to determine whether the police had sufficient probable cause to arrest Michael. Instead, we exercise our "sound discretion" and address the second prong of the qualified immunity analysis: whether the unconstitutionality of the officers' conduct was clearly established. *See Pearson*, 129 S. Ct. at 818. We conclude that it was not.

---

[17]There is some dispute among the parties regarding whether Stephanie's body was actually in the doorway—preventing the door from being closed—at 4:30 a.m. However, given that her body was in that position when paramedics and police arrived a couple hours later and no one seems to have clearly stated at the time that someone moved the body, a reasonable police officer certainly could have believed that Stephanie's body was in that position from the time she died until the time she was discovered the next morning.

[18]There was also no sign of forced entry, but this fact is largely negated by the fact that at least some doors and windows to the house were unlocked.

**[13]** The Supreme Court has held that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). When that happens, the officials "should not be held personally liable." *Id.* We have held that officers are immune from suit "when they reasonably believe that probable cause existed, even though it is subsequently concluded that it did not, because they 'cannot be expected to predict what federal judges frequently have considerable difficulty in deciding and about which they frequently differ among themselves.' " *Smiddy v. Varney*, 665 F.2d 261, 299 (9th Cir. 1981) (quoting *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339, 1349 (2d Cir. 1972) (Lumbard, J., concurring)), *overruled on different grounds by Beck v. City of Upland*, 527 F.3d 853, 865 (9th Cir. 2008).

**[14]** Defendants are entitled to qualified immunity because they could have reasonably believed that probable cause existed. Michael had stated that when he woke up in the middle of the night he saw nothing unusual, even though Stephanie's room was near Michael's room and the detectives believed that by that time, Stephanie was dead in her doorway. In addition, there were no signs of forced entry, suggesting that the murderer might have had access to the inside of the house. Finally, the information that the officers had regarding Tuite was not sufficiently strong to compel a reasonable officer to believe that Michael was not the most likely suspect.

In sum, although we make no judgment on whether "the facts and circumstances within the officer's knowledge [were] sufficient to warrant a prudent person to believe that" Michael committed the murder, *Barry*, 902 F.2d at 773, we hold that the officers are entitled to qualified immunity on this claim because a reasonable officer could have believed that probable cause existed.

## B.  *Aaron's Arrest*

**[15]** Aaron similarly challenges the sufficiency of the probable cause justifying his arrest on February 11, 1998. The district court granted summary judgment in favor of defendants. *Crowe I*, 303 F. Supp. 2d at 1085. Because police had additional information suggesting Aaron's involvement by the time of his arrest, we affirm the district court's conclusion that there was sufficient probable cause.

In addition to the information available at the time of Michael's arrest, the police also had the benefit of the following information implicating Aaron when they arrested him: (1) Joshua's statement that Aaron had given him a knife and told him that the knife was the knife used to kill Stephanie and that Aaron had participated in the killing with Michael[19] (2) the knife used to kill Stephanie fit the description of Aaron's knife; (3) Aaron's knife was found under Joshua's bed. *Id.* at 1084-85. This information—even in light of the information regarding Tuite—is sufficient to cause a prudent person to conclude that there was a reasonable possibility that Aaron was involved in Stephanie's death. The district court properly granted summary judgment in favor of defendants.

## C.  *Searches of Aaron's Home*

Police twice obtained search warrants and searched the Houser residence, on January 27, 1998 and February 11, 1998. *Id.* at 1079, 1082. The district court held that both search warrants were supported by probable cause. *Id.* at 1079-80, 1082-84. Aaron argues the district court erred because police deliberately made material misrepresentations in obtaining the search warrants.

---

[19]The district court concluded that this part of Joshua's February 10, 1998 statement was uncoerced. *Id.* at 1083. Michael and Aaron have not challenged this finding.

Probable cause exists when "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). In reviewing a search warrant on probable cause grounds, this Court, like the district court, is "limited to the information and circumstances contained within the four corners of the underlying affidavit." *United States v. Stanert*, 762 F.2d 775, 778, *amended on other grounds*, 769 F.2d 1410 (9th Cir. 1985). The evidence in the affidavit need not necessarily be admissible, but must be "legally sufficient and reliable." *Franklin*, 312 F.3d at 438.

**[16]** A misrepresentation in the affidavit constitutes a violation of the Fourth Amendment if the misrepresentation is material. *See Franks v. Delaware*, 438 U.S. 154, 171-72 (1978). Misrepresentations can be affirmative or based on omission. Affirmative misrepresentations are material only if there is no probable cause absent consideration of the misrepresented facts. *Id.* A misrepresentation based on an omission is material only where the omitted facts "cast doubt on the existence of probable cause." *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992) (internal quotation marks omitted). If a plaintiff is able to demonstrate that a warrant was issued as the result of a material misrepresentation, a police officer defendant may still be entitled to summary judgment on qualified immunity grounds, unless the plaintiff can also demonstrate that the police officer deliberately falsified information presented to the magistrate or recklessly disregarded the truth. *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995).

Thus, to determine whether the two warrants were supported by probable cause, we must exclude any misrepresentation contained in supporting affidavits, add any information which was improperly omitted from the affidavits, and then determine whether the remaining information is sufficient to create probable cause. We conclude that only the second warrant was supported by sufficient probable cause, but also that

the first warrant does not conclusively demonstrate a deliberate falsification of information or reckless disregard for the truth such that defendants are entitled to qualified immunity. We therefore, affirm the district court's grant of summary judgment as to both warrants.

### 1.  January 27 Search

The affidavit in support of the January 27 warrant contained the following information, as summarized by the district court, none of which can fairly be characterized as a misrepresentation:

> Defendant Claytor told Detective Han that multiple stab wounds were found on Stephanie's body and those wounds were consistent with a 5-6 inch knife blade. Through interviews, the investigation revealed that Michael Crowe and Aaron Houser are friends. On 1-22-98, detectives Lanigan and Naranjo interviewed Aaron Houser at his residence. Aaron told Detective Naranjo and Lanigan that he and Michael had been friends for over a year and had mutual interest in computer games and in medieval fantasy role play games as well as in weapons, including swords, knives, dirks and daggers. Aaron told the detectives that Michael knew that he had a medieval sword and knife collection but that he had never lent Michael any of his collection. On 1-27-98, Detective J. Lanigan received a telephone call from Margaret Houser, Aaron's mother. Margaret Houser told Detective Lanigan that Aaron had checked his medieval sword and knife collection and that one of the knives was missing. The missing knife was described as being stainless steel in color, with black plastic inserts on the handle and a 4-5 inch blade that came to a point and was sharpened. The knife was further described as having a hand stop and has indentations to facilitate a firmer grip.

*Crowe I*, 303 F. Supp. 2d at 1078. This information is sufficient to establish probable cause to search the Houser residence. However, we must also determine whether police made any material omissions in the affidavit which would cast doubt on the existence of probable cause.

**[17]** Aaron argues that police deliberately omitted material information regarding Tuite and the fact of unlocked doors and windows in the Crowe house. It is true that there was information known to the police at the time of the affidavit that now appears material, particularly the actions of Tuite, that the police did not include in the affidavit. "[W]here omissions are involved materiality may not have been clear at the time the officer decided what to include in, and what to exclude from, the affidavit. In such cases, when it is not plain that a neutral magistrate would not have issued the warrant, the shield of qualified immunity should not be lost, because a reasonably well-trained officer would not have known that the misstatement or omission would have any effect on issuing the warrant." *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1126 (9th Cir. 1997).

California Municipal Judge Ramirez, who signed the warrant, stated later that had he known "that the sliding glass door in the bedroom was unlocked and partially open, and that a transient had been knocking on doors looking for a female I would have asked more questions and required more information before signing the search warrant." While this would suggest it is plain the magistrate would not have issued the warrant, the even unconscious benefit of hindsight cannot be overlooked here. For example, at the time, Cheryl Crowe's testimony indicated that she was in her bedroom, awake, until 11 p.m., which is the latest time Stephanie could have been alive. Therefore, it was not necessarily reckless for police to assume no one could have entered through the door while Cheryl was awake, and she was awake during the entire time Stephanie could have been murdered.

**[18]** There appears to be enough uncertainty around the state of the windows and doors that given the information known to the police at that time, it would not have been plain that *any* magistrate would not have issued the warrant, even if it appears now, given all the information, that perhaps the warrant should not have issued. Therefore, while not deciding whether the omissions in the affidavit were sufficiently material misrepresentations to constitute a violation of the Fourth Amendment,[20] we find the defendants entitled to qualified immunity on this point, and affirm the district court's grant of summary judgment.

## 2. *February 11 Search*

The February 11 search warrant was based on: (1) the fact that Michael was arrested for Stephanie's murder and Michael's friendship with Aaron and Joshua; (2) the first interview of Joshua, at his home, during which a knife was seen in his possession; (3) the search of the Treadway residence which uncovered a knife that Aaron had reported missing; (4) the January 27 search of the Houser residence; (5) information gained from Joshua's statements during interrogation. *Crowe I*, 303 F. Supp. 2d at 1082-83. Some of the information gained during Joshua's interrogation must be excluded. *See Franklin*, 312 F.3d at 438 (information in a supporting affidavit must be "legally sufficient and reliable"). As discussed previously, the district court determined that the latter portion of Joshua's February 10 interrogation was coerced.[21] *See Crowe I*, 303 F. Supp. 2d at 1081. During the uncoerced part of his interrogation, Joshua stated that Aaron had given him a knife and told him that the knife was used to kill Stephanie and that he (Joshua) had agreed to hide the

---

[20]Here we exercise the discretion given in the Supreme Court's recent decision, *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), to decide the issue of whether the violation was clearly established without deciding whether there was actually a violation in the case.

[21]Defendants have not disputed this finding on appeal.

knife. *Id.* Any other information, which was gained as a result of coercion, must be excluded from the probable cause analysis. Any information gained during the January 27 search of the Houser residence must also be excluded, as there was insufficient probable cause to search the house at that time.

**[19]** Thus, the information properly included in the affidavit was Michael's arrest, the search of the Treadway residence, the initial interview of Joshua, and the information from the uncoerced portion of Joshua's February 10 interrogation. Evaluating the information as a whole, there was a fair probability that evidence related to the death of Stephanie Crowe would be found at the Houser residence. *See Gates*, 462 U.S. at 238-39. The search warrant was supported by sufficient probable cause. Accordingly, we affirm the district court's grant of summary judgment as to the February 11 search.

## V.   Strip Searches

On January 21, 1998, Michael, Cheryl, Stephen, and Shannon Crowe were strip searched and photographed nude or semi-nude. The Crowes argue that these searches violated their Fourth Amendment rights. In response, defendants argue that the searches were conducted pursuant to valid consent and were thus constitutional. *See United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004) (searches conducted pursuant to valid consent are constitutional). The district court granted summary judgment in favor of defendants with respect to Michael's claim, but denied summary judgment with respect to the claims of the remainder of the Crowe family. *Crowe II*, 359 F. Supp. 2d at 1021-23. We affirm.

**[20]** Michael argues that although he did consent to the strip search, his consent was obtained by coercion. It has long been established that consent to search must be given freely and voluntarily. *See, e.g.*, *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). Whether consent was voluntarily given must

be determined by evaluating the totality of the circumstances and the government has the burden to proof. *Patayan Soriano*, 361 F.3d at 501. However, at his deposition Michael testified as follows:

> Q. Do you recall anything else your father said about the subject of the photographs?
>
> A. Later, right before he did it, he told us to go ahead and do it and help them out. Just do whatever we could to help.
>
> Q. Did he say why he wanted you to go ahead and do the photos to help out?
>
> A. He just told us to go do the photos to help out.
>
> Q. When he said to help out, did you understand that to mean that he was asking you to go ahead with the photographs to help the officers determine what had happened to Stephanie?
>
> A. Yes.
>
> Q. Were you willing to do that then?
>
> A. Yes.
>
> Q. Then did you voluntarily partake in the photographing process?
>
> A. Yes.

[21] Although Michael argues that his father was told that his family would be arrested if he didn't consent to the search, Michael does not allege that he was told anything of the sort by either his father or the police. In light of Michael's deposition testimony and the absence of any other evidence in the

record suggestive of coercion, there is no material issue of genuine fact as to whether Michael validly consented to the search. The district court thus properly granted summary judgment in favor of defendants.[22]

[22] The record does, however, create a genuine issue of material fact as to whether Cheryl, Stephen, and Shannon Crowe validly consented to their strip searches. The Escondido defendants cite deposition testimony from Michael and Shannon to support their argument that the entire Crowe family consented to strip searches. Specifically, they identify Michael's statement that "[my father] just told us to do the photos to help out," and Shannon's statement that "I just went along with it because I thought it would help." These two statements are not sufficient to meet the government's burden of proving that any consent from the Crowes was freely and voluntarily given, nor are they sufficient to demonstrate that a reasonable officer would have thought that the Crowes freely and voluntarily consented to the searches. The district court properly denied summary judgment.

## VI.   Cheryl and Stephen Crowe's Additional Fourth Amendment Claims

Cheryl and Stephen Crowe claim two further Fourth Amendment violations. First, they allege that warrants ordering them to provide blood samples were not supported by probable cause. Second, they allege that they were unlawfully detained in the Escondido police station on the day of Stephanie's murder. The district court denied summary judgment to defendants on both counts, *Crowe II*, 359 F. Supp. 2d at 1023-26, and we affirm.

---

[22]Michael additionally argues that he was too young to consent to a strip search. However, he cites no authority suggesting that a 14-year-old cannot consent to a strip search and we are aware of none.

## A. *Blood Samples*

On February 5, 1998, Officer Claytor sought and obtained search warrants for blood samples from Cheryl and Stephen. *Crowe II*, 359 F. Supp. 2d at 1023. On February 6, 1998, Cheryl and Stephen provided blood samples pursuant to the warrants. *Id.* The district court held that the warrants were not supported by probable cause because the evidence was sought to prove that an individual other than Cheryl or Stephen committed the crime. *Id.* at 1023-24. The district court denied qualified immunity, concluding that it was clearly established that probable cause must be particularized with respect to the person to be searched or seized. *Id.*

The Escondido defendants argue that they are entitled to qualified immunity for two reasons. First, they argue that Cheryl and Stephen consented to having their blood drawn, based on deposition testimony from Stephen in which he stated that they *would have* cooperated with a request for blood in the absence of a search warrant. This argument is unavailing because the Crowes did not give consent, they submitted to a search warrant. *Crowe II*, 359 F. Supp. 2d at 1023. Defendants cannot hide behind a consent defense when no such consent was given.

**[23]** Second, the Escondido defendants argue that the district court erred in determining that the search warrants were not supported by probable cause. The affidavit in support of the warrants contained the following information:

> (1) that Stephanie Crowe had been stabbed to death in her home; (2) that Cheryl and Stephen Crowe were in the house at the time of Stephanie's death; (3) that blood analysis would tend to show that a "particular" (but unspecified) person committed the murder; and (4) that to have valid test results, all persons that had contact with the victim needed to be eliminated as a source of the blood.

*Id.* Defendants argue, as they did before the district court, that the affidavit was supported by probable cause because the blood was sought to prove that someone other than Cheryl or Stephen killed Stephanie. As the district court noted, the Supreme Court and this Court have both long held that probable cause must be particularized with respect to the person to be searched or seized. *See, e.g.*, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."); *Rise v. Oregon*, 59 F.3d 1556, 1560 (9th Cir. 1995), *overruled on other grounds by City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) ("[T]he drawing of blood from free persons generally requires a warrant supported by probable cause to believe that a person has committed a criminal offense and that his blood will reveal evidence relevant to that offense . . . ."). As the district court also noted, a police officer is not entitled to qualified immunity for a search conducted pursuant to a search warrant "where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Mills v. Graves*, 930 F.2d 729, 731 (9th Cir. 1991). Under clearly established Supreme Court and Ninth Circuit law, no reasonable police officer could have believed that the desire to prove that another person (presumably Michael) killed Stephanie established probable cause to draw Stephen and Cheryl's blood. The district court properly denied summary judgment and qualified immunity.

## B. *Unlawful Detention*

**[24]** The district court also properly denied summary judgment as to Cheryl and Stephen's claim that they were unlawfully detained at the Escondido police station on January 21, 1998. Cheryl and Stephen allege that when they attempted to leave the police station Detective Wrisley pulled out his gun, pointed it at Stephen's chest, and ordered Stephen and Cheryl back upstairs, where they remained until Wrisley told them that they had to go to a hotel and could not leave with Ste-

phen's brother, as Stephen had requested. *Crowe II*, 359 F. Supp. 2d at 1026. The district court denied summary judgment on the grounds that, viewing the facts in the light most favorable to the plaintiffs, Cheryl and Stephen had been seized and defendants failed to provide any justification. *Id.* The Escondido defendants argue that Cheryl and Stephen returned upstairs voluntarily. In support of that argument, defendants cite Stephen's deposition in which he stated that *after Detective Wrisley pointed a gun at them and ordered them upstairs*, Cheryl said "let's go back upstairs" and Stephen responded "fine, let's go back upstairs." Defendants' argument is untenable. Assent in the face of an order from a police officer, emphasized with a firearm, cannot reasonably be interpreted as consent. The district court properly denied summary judgment and qualified immunity.

## VII.   Conspiracy Claims

The district court granted defendants' summary judgment motion as to all conspiracy claims against defendant Blum and Fourth Amendment conspiracy claims against defendant McDonough on the grounds that neither Blum nor McDonough physically participated in the relevant arrests and searches and there was insufficient evidence to establish that they was part of a conspiracy broad enough to encompass the relevant claims. *Crowe I*, 303 F. Supp. 2d at 1064-67, 1098. We reverse the district court's decision as to Blum, and affirm as to McDonough.

[25] To establish liability for a conspiracy in a § 1983 case, a plaintiff must "demonstrate the existence of an agreement or meeting of the minds" to violate constitutional rights. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999) (internal quotation marks omitted). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.* "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each partici-

pant must at least share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (en banc).

**[26]** Plaintiffs' theory of liability as to Blum is that he conspired with the Escondido police and is thus liable for unconstitutional acts committed by other defendants. "A private individual may be liable under § 1983 if she conspired or entered joint action with a state actor." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002). Establishing liability for a conspiracy between a private actor and a state actor is no different from establishing liability for a conspiracy between two state actors. The plaintiff must show "an agreement or meeting of the minds to violate constitutional rights," and "[t]o be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Id.* (internal quotation marks omitted).

**[27]** The record shows that the quality of Blum's involvement in the interrogations is not categorically inconsistent with a tacit "meeting of the minds." According to one of the detectives, Blum helped the police formulate a "tactical plan" to approach the interview. Moreover, the detectives "pretty much" followed his advice after these consultations. Insofar as these tactics and lines of questioning by the detectives shock the conscience, as demonstrated above, summary judgment in favor of Blum is unwarranted. A meeting of the minds can be inferred from circumstantial evidence, and Blum's involvement in the interrogations, particularly in formulating and directing the tactical plan, is sufficient for a reasonable factfinder to conclude it was "unlikely to have been undertaken without an agreement," of some kind between the defendants. *Mendocino Envtl. Ctr.*, 192 F.3d at 1301. We therefore reverse the district court's grant of summary judgment on this point.

**[28]** We also affirm the district court's grant of summary judgment on the Fourth Amendment conspiracy claim against

McDonough. The district court concluded that although "a reasonable factfinder could find that there was a 'meeting of the minds' between defendant McDonough and the other defendants regarding the coercion of a confession from the boys," McDonough was not liable for the alleged Fourth Amendment violations because the plaintiffs did not "demonstrate that [McDonough] shared the common objective of the larger conspiracy alleged by plaintiffs: a conspiracy to wrongfully prosecute and convict the boys." *Crowe I*, 303 F. Supp. 2d at 1067. We agree. The key inquiry is whether McDonough shared a "common objective" with the Escondido police officers to falsely prosecute the boys. A "common objective" to merely prosecute the boys is insufficient; fair prosecution would not violate the boys' constitutional rights. It is too great a leap to conclude that help in obtaining a confession—even a coerced confession—suggests that McDonough shared the common objective of falsely prosecuting the boys. The district court's grant of summary judgment in favor of McDonough is affirmed as to the Fourth Amendment conspiracy claims.

## VIII.   Deprivation of Familial Companionship Claims

The Crowes and the Housers each alleged that their Fourteenth Amendment rights to familial companionship were violated by Michael's and Aaron's detentions. Additionally, the Crowes allege that defendants denied them their Fourteenth Amendment rights to familial companionship by placing Michael and Shannon in protective custody prior to Michael's arrest.

The district court granted summary judgment in favor of defendants as to the Crowes' and Housers' detention claims on the ground that Michael and Aaron's arrests were supported by probable cause and thus their detentions did not constitute "unwarranted governmental interference" with the families' relationships. *Crowe I*, 303 F. Supp. 2d at 1098-99; *Crowe II*, 359 F. Supp. 2d at 1039. Because Michael's and

Aaron's continued detentions were wrongfully justified by their illegally coerced confessions, we reverse.

[29] "It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child and that the state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. § ] 1983." *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (internal quotation marks omitted) (alteration in *Lee*); *see also Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999); *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985)). "[U]nwarranted state interference" with the relationship between parent and child violates substantive due process. *Fontana*, 818 F.2d at 1418.[23]

The district court granted summary judgment against the Crowes' and Housers' claims on the ground that Michael's and Aaron's arrests were justified by probable cause. However, the lack of familial companionship that the Crowes and Housers experienced was not due, in any significant part, to the boys' arrests; it was due to the boys' incarceration. Thus, the relevant consideration is not whether the boys' were wrongfully arrested; it is whether they were wrongfully detained.

[30] We conclude that the boys were wrongfully detained. Their coerced confessions were introduced at their *Dennis H.* hearing, where it was determined that they would remain incarcerated. However, the boys' confessions were coerced and thus not legally sufficient grounds upon which to make a

[23]Defendants argue that the correct standard is whether defendants' conduct "shocked the conscience." There is no support in the relevant case law for this assertion. The standard for deprivation of familial companionship is "unwarranted interference," not conduct which "shocks the conscience." *See Lee*, 250 F.3d at 686; *Fontana*, 818 F.2d at 1418.

pre-trial detention determination. Having conducted the inter-
rogations, the officers were aware both that the confessions
were coerced and that the confessions could be used to keep
the boys in jail. We reverse the district court's grant of sum-
mary judgment as to this claim.

The district court denied summary judgment as to the
Crowes' familial companionship claim based on the place-
ment of Michael and Shannon in protective custody on the
ground that defendants failed to demonstrate that the place-
ment was warranted under applicable California law. *Crowe
II*, 359 F. Supp. 2d at 1039-40. We agree with the district
court and affirm its denial.

## IX.   Defamation Claims

### A.   *Stephan*

Michael and Aaron brought state law defamation claims
and § 1983 "defamation plus" claims against Deputy District
Attorney Summer Stephan based on statements she made dur-
ing an appearance on the news program "48 hours" shortly
after the indictments against the boys were dismissed. In her
motion for summary judgment, Stephan argued that the pieces
of her statements that were aired were taken out of context of
the interview as a whole. The interview lasted two hours and
twenty minutes, and the program aired two minutes and nine
seconds of that interview. *Crowe I*, 303 F. Supp. 2d at 1103.
The district court examined each of the statements plaintiffs
identified in their opposition to summary judgment as they
were made in the context of the unedited interview and ulti-
mately granted summary judgment in favor of Stephan. *Id.* at
1105-1112. On appeal, Michael and Aaron argue that the dis-
trict court erred because, in the context of the unedited inter-
view, Stephan's statements imply that the boys killed
Stephanie.[24]

_____

[24]As an initial matter, Stephan argues that Michael and Aaron waived
their claims as to any statement not specifically discussed in the Crowe

### *1. State Law Defamation*

California Civil Code § 44 defines "defamation" as either libel or slander. California Civil Code § 46 provides:

> Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which:
>
> 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime;
>
> 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease;
>
> 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits;
>
> 4. Imputes to him impotence or a want of chastity; or
>
> 5. Which, by natural consequence, causes actual damage.

If a statement falls within § 46(1)-(4), it is considered defamatory per se. *See Rodriguez v. Panayiotou*, 314 F.3d 979, 983

---

brief. This argument misses the point of the boys' argument on this issue. The boys did not claim that Stephan made several, separately actionable, defamatory statements. Rather, they claim that her statements during the interview, taken as a whole, communicate the defamatory statement that the boys killed Stephanie. The boys have not waived any portion of their defamation claims against Stephan.

(9th Cir. 2002). Michael and Aaron allege that Stephan's statements violated California Civil Code § 46(1) by implying that they killed Stephanie.[25]

[31] In order to fall outside the scope of First Amendment protection, an alleged defamatory statement must "contain a provably false factual connotation." *Gilbrook v. City of Westminster*, 177 F.3d 839, 861 (9th Cir. 1999) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)). Thus, in reviewing a defamation claim, a court must first ask the threshold question: "Could a reasonable factfinder conclude that the contested statement implies an assertion of objective fact?" *Id.* at 861-62. If the answer to that question is yes, then the propriety of the district court's grant of summary judgment depends on whether Michael and Aaron created a triable issue of fact as to the falsity of Stephan's statements. *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1052 (9th Cir. 1990).

We have adopted a three-part test to determine whether a reasonable factfinder could conclude that the contested statement implies an assertion of objective fact:

> First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Gilbrook*, 177 F.3d at 862 (quoting *Underwager v. Channel*

---

[25]Plaintiffs do not allege that Stephan explicitly stated that the boys killed Stephanie, nor does the transcript of the interview contain any such explicit statement.

*9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995)). Additionally, "defamatory meaning must be found, if at all, in a reading of the publication as a whole . . . . Defamation actions cannot be based on snippets taken out of context," *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998). Stephan's statements must be analyzed in the context of the entire interview, not just the portion the program chose to air.

During the interview, Stephan explained the evidence that had supported the prosecution of the boys, explained the decision to dismiss the indictments against the boys based on the newly discovered evidence which implicated Tuite, and repeatedly asserted that the investigation was on-going and that it remained to be seen who might ultimately be brought to trial for Stephanie's murder. Michael and Aaron identify several individual statements which they allege to be defamatory, including statements regarding the evidence which Stephan said implicated them, as well as evidence which Stephan said seemed contrary to a theory that Tuite killed Stephanie.[26]

[32] Applying the *Underwager* three-part test to the alleged defamatory statements, a reasonable fact-finder could not conclude that Stephan implied that the boys actually did kill Stephanie. Viewed in the context of the interview as a whole, even Stephan's most questionable statements can only be interpreted as describing the evidence that led the police to investigate the boys and allowed the prosecution to continue as far as it did and expressing the facts that the investigation had not concluded and that it was still possible that either the boys or Tuite would ultimately be tried for Stephanie's murder. Indeed Stephan repeatedly emphasized that it was unclear who the real perpetrator was. For example, early in the interview Stephan was asked "[D]o you believe that one day somebody, someone, some people will pay for the murder of Stephanie Crowe?" Stephan responded, "The conclusion

---

[26]The specific statements are detailed in the district court opinion. *See Crowe I*, 303 F. Supp. 2d at 1105-09.

might be that the young men will face justice. It might be that the transient will face justice. It might be that another person will face justice." Also, at the end of the interview, Stephan was asked, "Are you saying that you believe the boys did it and you just can't prove it?" Stephan responded, "I'm not saying that at all. I am saying that we have to start from the beginning. . . . the young men, the transient and maybe others out there are potential suspects in this case. We're not excluding anyone at this point." At most, Stephan implied that the boys *may* have killed Stephanie, not that they necessarily did. This expression of a possibility, particularly when juxtaposed to another mutually exclusive possibility, does not express a "provably false" fact. The district court thus properly granted summary judgment.

### 2.   Section 1983 "Defamation-Plus" Claims

A § 1983 "defamation-plus" claim requires an allegation of injury to a plaintiff's reputation from defamation accompanied by an allegation of injury to a recognizable property or liberty interest. *Cooper*, 924 F.2d at 1532. "There are two ways to state a cognizable § 1983 claim for defamation-plus: (1) allege that the injury to reputation was inflicted in connection with a federally protected right; or (2) allege that the injury to reputation caused the denial of a federally protected right." *Herb Hallman Chevrolet v. Nash-Holmes*, 169 F.3d 636, 645 (9th Cir. 1999).

As discussed above, Stephan's statements during the "48 Hours" interview were not defamatory as a matter of law. Thus the boys' defamation-plus claim fails as well, and the district court properly granted summary judgment. *See Cooper*, 924 F.2d at 1532.

### B.   *Blum*

Aaron also brought a state-law defamation and a § 1983 defamation-plus claim against Dr. Lawrence N. Blum based

on statements Blum made to Escondido police officers. Detective Claytor testified in a deposition that Blum assessed Aaron as "exhibiting sociopathic tendencies." *Crowe I*, 303 F. Supp. 2d at 1112. Claytor also testified that Blum told the Escondido Police Department that "[Aaron] is a Charles Manson with an IQ." *Id.* In addition, Blum admitted in his own deposition that during a phone call with Detective Anderson on January 31, 1998, Blum stated that he thought that Aaron was a "Charlie Manson wannabe" and that he was "highly manipulative and controlling." *Id.* The district court granted summary judgment, concluding that these statements were not defamatory as a matter of law.

### 1. State Law Defamation

Aaron argues that the district court erred because the statements implied that Aaron participated in Stephanie's murder and thus constitute defamation per se under California Civil Code § 46(1). First, the statements regarding Aaron "exhibiting sociopathic tendencies" and being "highly manipulative and controlling" cannot constitute defamation per se under California Civil Code § 46(1) because they do not charge Aaron with a crime. Rather, they are statements regarding Aaron's psychological profile. While they may—or may not—be provably false, they do not constitute defamation per se, Aaron would have to allege actual damage to maintain a defamation allegation. *See* Cal. Civil Code § 46(5). As Aaron has made no such allegation, his defamation claim as to these two statements necessarily fails.

[33] Aaron's defamation claim based on the Charles Manson comparison also fails. First, the statement is "the type of colorful, figurative rhetoric that reasonable minds would not take to be factual." *Gilbrook*, 177 F.3d at 862 (reference to plaintiff as a "Jimmy Hoffa" not actionable); *see also Underwager*, 69 F.3d at 367 (statement that plaintiff is "intrinsically evil" not actionable because not capable of verification). Second, in the context in which it was given—a statement to

police by a psychologist contracted to observe police interrogations—the statement can most reasonably be interpreted as a commentary on Aaron's psychological profile, as opposed to an assertion that he committed a particular crime. The district court properly granted summary judgment in favor of Blum.

### 2.   Section 1983 "Defamation-Plus" Claim

Aaron's defamation-plus claim fails because Blum's statements were not defamatory as a matter of law. The district court properly granted summary judgment as to this claim as well. *See Cooper*, 924 F.2d at 1532.

## X.   Municipal Liability Claims

In their complaint, plaintiffs assert causes of action against the City of Escondido and the City of Oceanside under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Because the district court held that McDonough—the only Oceanside police officer named in the suit—was entitled to summary judgment with respect to all of plaintiffs' claims, the district court determined that the City of Oceanside was also entitled to summary judgment on plaintiffs' *Monell* claims. *Crowe I*, 303 F. Supp. 2d at 1115. Similarly, the district court granted summary judgment with respect to the *Monell* claims against the City of Escondido which were predicated on the alleged Fifth Amendment violations. *Id.*; *see also Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[N]either *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.").

Because we hold that the officers did inflict constitutional harm, we consider the *Monell* claim. *Monell* held that "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the

action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690. A municipality is not liable for all constitutional torts committed by its employees, however: "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691. The constitutional tort must have been committed "pursuant to official municipal policy." *Id.*

**[34]** On appeal, plaintiffs allege their *Monell* claim on the basis of statements made by Escondido and Oceanside officials that McDonough, Claytor, and Wrisley complied with Escondido's and Oceanside's policies and procedures. However, *Monell* is clear that the constitutional tort must follow from "official municipal policy." Plaintiffs do not allege that Escondido or Oceanside municipal policy permits or encourages the practice of coercing confessions. Therefore, the *Monell* claims fail.

## XI. Conclusion

We reverse the district court's grant of summary judgment as to: (1) Michael and Aaron's Fifth Amendment claims; (2) Michael and Aaron's Fourteenth Amendment substantive due process claims; (3) all otherwise surviving claims against McDonough; (4) all otherwise surviving claims against Blum; (5) the Crowes' deprivation of familial companionship claim based on Michael's detention; and (6) the Housers' deprivation of familial companionship claim based on Aaron's detention. We affirm the district court's grant of summary judgment as to: (1) Aaron's Fourth Amendment claim that police lacked probable cause to arrest him; (2) Michael's Fourth Amendment claim that police lacked probable cause to arrest him; (3) Michael's claim that police violated his Fourth Amendment rights by strip searching him; (4) Aaron's Fourth Amendment claim that the warrants authorizing the search of

his home were not supported by sufficient probable cause; (5) the conspiracy claims against McDonough; (6) Michael and Aaron's defamation claims against Stephan; (7) Aaron's defamation claim against Blum; and (8) all claims against the Cities of Escondido and Oceanside. Additionally, we affirm the district court's denial of summary judgment as to: (1) Cheryl, Stephen, and Shannon Crowes' claims that police violated his Fourth Amendment rights by strip searching them; (2) Cheryl and Stephen's Fourth Amendment claims that the warrant authorizing police to draw blood samples was not supported by probable cause; (3) Cheryl and Stephen's Fourth Amendment claims of wrongful detention; and (4) the Crowes' deprivation of familial companionship claims based on the placement of Michael and Shannon in protective custody. We remand to the district court for further proceedings consistent with this opinion.

Each party shall bear their own costs on appeal.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**